All right, whenever y'all are ready, we'll hear from Mr. Chalkley. Your Honors, I'm Chip Chalkley on behalf of the Appellant, Renasant Bank. As the Court knows, this is a case arising out of loan transactions made by an employee of Renasant Bank, Wendy Hurt. The borrowers of those loans defaulted, and Renasant sustained a loss of approximately $8 million. Now, Renasant has produced evidence of acts and omissions of Wendy Hurt in connection with these two loans, which clearly show fraud and dishonesty on the part of Ms. Hurt. The borrowers, meanwhile, profited from these loans at Renasant's expense. Renasant Bank was covered by – But she did not, unless we count the commissions. Well, Your Honor, I think that there's a question of fact regarding how she profited from these loans. Tell me, other than the commissions, which is a separate argument, point me to evidence in the record that shows she profited from these loans. Well, Your Honor, I think that if you examine the surrounding circumstances, which this Court must under the applicable law, the acts and omissions of Ms. Hurt, it clearly should create a question of fact for a jury to determine whether or not she – I'm sorry. My question was, point me to evidence in the record. Other than the commissions, show me how she profited from this transaction. Well, Your Honor, she had a history of doing business with these borrowers and, in fact, took the main borrower with her to her succeeding place of employment and continued to do business with that borrower. There's nothing unusual about that, is there? Well, given what happened with these loans and the amount of loss suffered, I think it was unusual that she would continue to do business on borrowers who had put the bank through what they put this bank through. These loans were presented to the Board, weren't they? They were, Your Honor. However, Ms. Hurt made numerous misrepresentations to the Board in order to secure approval. Specifically, she altered these documents with handwritten alterations after they were approved by the Board in order to try to cover the tracks of what they'd done. What was changed? Namely, the amount – the collateral that the bank would be receiving in the transaction, which is really the essential problem with these loans, is that the collateral was represented to be one thing and then ended up being another, which put the bank at an extreme disadvantage in trying to collect on the loans. Can you point me to any money or tangible goods she received other than the commissions? I cannot, Your Honor. That was my question. So your focus then is on the commissions, and it seems to be on this parsing of the phrase normal course or whether it was normal to get these commissions. Why isn't it – I understand you think the transaction was dishonest, but why isn't it normal for someone to get a commission if they're in a commissioned job? Well, Your Honor, it's not normal to misrepresent collateral on loans. It's not normal to make alter handouts. But it's normal to get commissions on a transaction. Yes, it is. Yes, it certainly is. But that's not the same thing as, oh, I'll get you this loan of a million dollars. You've got to give me $100,000 kickback. That would be abnormal. That would not be a commission. That would be the kind of thing we're looking for. Or, you know, you'll give me part of this property or whatever that you're getting out of this. But here she does a transaction that you all question and challenge. I understand that. However, she gets the commission she would have gotten in the ordinary course. She didn't get any kickback or anything that we know about from the borrowers. That's correct, Your Honor. But the argument we make is that if loans are clearly fraudulent and if there are misrepresentations and accident omissions, as there were over and over by Ms. Hurte, then that is not in the normal course of business, as the language of the bond reads. And if it's not in the normal course of business, it cannot be excluded by that language in the bond. But isn't your main argument that this personal gain provision in the policy should be invalidated because it's inconsistent with the Mississippi statute? That is one of my points, one of Renaissance's points, Your Honor. There is a statute. I thought it was the main dispute, but I know you have a backup argument. The statute here is Mississippi Code Annotated 81515, which requires Mississippi banks to obtain a bond and secure faithful performance of the job duties of its employees. The trial court correctly found in this case that the bond was in fact a statutory bond, but then it failed to apply the language of the statute. But it's not what the statute contemplates, really. I mean, if we're going to be holding everybody to the letter of the law, the letter of the law is that the employee provides a bond. That's not what this is. This is indemnity insurance obtained by the bank. And so it seems to me you're trying to have it both ways. You're trying to make this a statutory bond while ignoring the fact that it's not and then using that statutory bond as a kind of a hammer to say, well, and you have to cover everything, regardless of whether we prove any dishonesty as understood by the policy, you have to cover everything. This lady caused us a loss. You cover it. So it seems like you're trying to have it both ways. Explain to me why you're not. Well, the district court addressed that directly and found that the formality of who pays for the bond or who secures the bond is of no consequence in light of the statute's essential purpose. The essential purpose is to protect the banking public and the banking system of the state of Mississippi. Who buys the bond is a formality that does not affect that essential purpose. But if we construe this statute to cover everything caused by somebody's, you know, mistakes, misapprehensions, mis-whatevers, you're never going to be able to get this insurance or this insurance is going to be so costly that all these banks we're trying to protect are going to go out of business. So it seems to me you're trying to take this statute, construe its intent, and use that in your favor, but then as soon as that hurts you, then you don't want to construe the intent. You want to use the language of the statute. I'm saying if you can go with the language of the statute, you don't have a statutory bond. If you're going to go with the intent of the statute, the intent of the statute isn't to cover everything that somebody does wrong. It's to cover dishonesty. And this policy defines dishonesty as wrongdoing for gain. And what's wrong with that? Well, first, Your Honor, I think any statement, any evidence about what may or may not happen to the insurance industry is speculation. And there's no proof in this record one way or the other about that. And I don't think these are standard policies. We'd be the first court to say it. And there's, what, I think about 20 states that have similar statutes. Wouldn't we be the first court to say that this standard nationwide policy isn't consistent and has to be supplemented by these statutes that a lot of states have? Well, Your Honor, I think that the principle of reading in and reading out has been applied to numerous statutes. But to this form policy, has a court ever said the personal gain requirement is at odd with the statutes in this area? I think that there have been trial court decisions that have done so. I know of one in Tennessee where that has happened, but appellate court decisions on this issue have not happened. Now, Mississippi's statute, though, is notably more emphatic than other states that have statutes on this issue. The Mississippi statute contains the language that says the conditions, whether the instrument so describes the conditions or not, shall be, that the principle shall protect the obligee against any loss or liability that the obligee may suffer by reason of acts of dishonesty of the principle. Now, the other states do not have such emphatic language. And if you combine the language of that Mississippi statute with the case law that, again, interprets statutory bonds, which are a special case, statutory bonds are written to comply with the statute and private parties are not at liberty to But then what does dishonesty mean? And isn't that what the district court, in finding this to be a statutory bond, nonetheless said that the way the policy describes dishonesty or the policy's approach to personal gain versus, you know, I could make a big, giant mistake that hurts the bank a lot and don't gain anything from it, and I just was stupid. I mean, that could happen. And that's what we're trying to distinguish, dishonesty being a category of sort of intentional wrongdoing to gain versus I'm just a mess and I'm just in over my head. Well, I think in this case, Hurte's actions were clearly intentional. When you take all of the facts of the law. You see, the fact that she, you know, scribbles in a changement, I could envision where she told the borrower, you don't need, you're going to need X amount of collateral, and then the committee approved something different, and then she's got to try to make this right because she's got a borrower thinking one thing, the committee another. That isn't necessarily dishonesty. It's unethical in my view. I wouldn't do it. I'm not suggesting I would. But to me, statutory dishonesty is the kind of embezzling. Why would we be having bank officials having to give a bond? It's so that they're not embezzling money, basically. And I don't see that here, at least in the evidence you've shown me. I don't see an embezzlement. I don't see a kickback. What I see is somebody getting a little bit over their head. And that doesn't strike me as statutory dishonesty that you would need a bond from an officer to have. You could have errors and omissions type coverage. That's a different animal. Well, respectfully, Your Honor, I think that's a jury question. When you look at the facts of what Hurt did and did not do, the fact of the misrepresentations, the fact that she allowed draws to be taken on the loans without any documentation from the borrowers. But does the jury get to decide what the word dishonesty means, or does the court get to look at whether the insurance company's definition in the policy, by virtue of its requirements, fit the statute? Because I think it's a legal question what it means, not a jury question. Now, whether she actually had the intent or something, that might be a jury question. But what does dishonesty mean? And putting some parameters on it, that's what the district judge said is, look, this makes sense to me, let's have some objective factors so we aren't just trying to look at her heart because who knows what was in her heart. Well, I would argue that juries, on a daily basis, are tasked with determining intentional conduct from negligent conduct. It happens every day. Doesn't the financial benefit requirement focus the attention on whether it was fraudulent or whether it's a mistake or incompetence? Isn't that what it's in there for, to focus you on that? Well, that's part of our argument, Your Honor, that it is actually a hurdle to coverage. It narrows coverage, and that impermissibly in light of the Mississippi statute. Well, but how is that in conflict with a statute whose purpose is to protect the bank against dishonesty? This is a way to screen out some other cause like mistake. I mean, that's what most of the cases I've read say it is. Well, Your Honor, I think, again, in light of the statute, it's a jury's job to distinguish between whether something is fraudulent, intentional, or just negligent. Well, but it's pretty plain when you put that provision in the policy. Then you don't have that problem. That language is not present in the statute. Therefore, we argue it's not permissible to have that additional hurdle in the policy. What's your best case for that? I'm sorry? What's your best case for that? Well, Your Honor, I think the case, the Mississippi case that interprets this sort of statutory bond is Adams v. Williams. But that doesn't involve the financial benefit. No, it's a different type of bond. These cases cover many different types of bonds, but they're all statutory bonds. But the Adams case says that sureties can neither add to nor detract from those conditions in the statute by anything they may choose to insert. The law declares all such surplus conditions absolutely void. Well, what's your best case for saying that the financial benefit provision conflicts with the statute? Well, I think all of this case law that discusses surplusage in the context of statutory bonds, although they're not financial institution bonds, they all lead to the conclusion that the court cannot just ignore the statute. The statute tells you what can be in the bond, and you can't— But do you have a case that says the financial benefit provision is one of those conflicts? Not an appellate decision. I believe it's happened in trial courts. The other argument I wanted to address briefly was actually my first argument, which is that the summary judgment ruling by the trial court was not case dispositive. There are other provisions. Even assuming that Renaissance has not shown a financial benefit, there are other provisions that provide coverage. Namely, the bond provides that if you don't show financial benefit, the loss will nevertheless be covered. If other persons with whom the employee was dishonestly and fraudulently acting in collusion received proceeds from the loan, and two, the bank establishes that the employee intended to share in the proceeds of the loan. These two points were not addressed by the district court at all. No, but they were raised in the summary judgment of St. Paul. That's true, but— So we can affirm for any reason supported by the record, and what evidence do you have that she intended to participate in the benefit? It's clear that she colluded with these borrowers because the bank found a secret hidden file many months after she left the bank, which showed that she was emailing back and forth with them, and she knew exactly what was happening in this transaction. She was actively deceiving the bank. What shows that she was intending to share in the proceeds? One of the borrowers in this case bought $70,000 worth of jewelry the day after the loan closed, and in the memo line of the check to the jewelry store, he wrote deal gifts. And then when that same borrower was asked about the whereabouts of the jewelry he bought that day, he couldn't account for all of it. That same borrower testified that he, quote, always took care of people who helped him get deals. Now these are evidentiary considerations in surrounding circumstances, as this court must evaluate when determining intent, that clearly create a jury question. In the case of F&BL v. Lustig— Okay, I think you're going past your time. Thank you. You have reserved time for rebuttal. Mr. Keeley. Good morning, Your Honors. Happy New Year. I'm not sure I can do a better job for St. Paul than the probing questions I've heard. I think you've hit on each of the key issues. The problem with this bond, which has been in existence basically for about six decades in this form, one of the problems is when you have a pure embezzlement, it's easy to find evidence of that. When the employee reaches his or her hands into the till, you can prove that he's right. The difficult claims that I've seen over time are the ones that's before the court right now. That is loan losses or loans that have gone bad. It's easy in hindsight for a bank— Because that's what I'm getting to. When a loan goes south, it's easy in hindsight to point to problems with a loan and say those instances were not just negligence or recklessness, but they were dishonest loans. Bad loans are made every day in this country. That's one of the reasons we have D&O insurance policies, as Your Honor alluded to, and that's one of the reasons we have dishonesty insurance policies, financial institution bonds. The problem is— That's why we have FDIC insurance for banks. Pardon me? I grew up as a lawyer in the 80s when banks and S&Ls were failing pretty much every week, and that's why we have FDIC and FSLIC-type insurance over the years. I knew you did, and I was before Your Honor back then fighting some of those exact cases. So the difficulty in the case that was before the district court was determining whether this was just a bad loan or poorly made loan or a loan made by a bank officer who was overworked and deciding whether it was truly dishonest. It is difficult most of the time to discern what is in the employee's mind. Was she making a bad loan, or did she really have some evil intent to cause the bank to sustain a loss? And from the beginning of these policies, dating back prior to 1934, the purpose of these policies is to provide coverage for employee dishonesty. Do you think the lack of any civil or criminal prosecution of mishirt is relevant, or do you think it's just something the judge mentioned in passing that we should all ignore? I think it's relevant. I think it's relevant to say that the bank did not truly believe this loan officer was dishonest because if it did, they would have prosecuted her. They would have filed suit against her to try to recover from her. She's apparently still functioning in this same capacity at some other bank. Apparently so, and if the FDIC and law enforcement believed she was dishonest, she would not be doing that. Law enforcement is very busy today, but they still get fees off the streets and out of banks. That was the problem with the banking system back in the 1930s when the statute was enacted. That remains a significant problem today. You make a good policy argument, and a number of courts have relied on them to say because it's so hard to sort out negligence versus fraudulent intent or intentional lying, it's okay to add in this requirement of personal gain. But would you acknowledge that the plain meaning of dishonesty doesn't require that? I mean to look at a common law fraud claim, common law fraud, you have to have intent to hurt the other side, but you don't have to have a gain. Your Honor, that's a great question. It goes to the meaning of dishonesty in the first instance, and what does that mean? And I would submit to the court that dishonesty in the context of a bank means embezzlement. What else does a bank want protection for? What else did the Mississippi legislature in 1934 want? They wanted protection not against bankers coming and double parking out front or coming in late. They wanted protection against them stealing from the bank. What about making a loan to a brother-in-law who clearly doesn't have the security to secure the bank loan? I mean they don't get anything personally out of it, but they make a loan to, say, a friend or a brother-in-law. Is that not dishonest? I think it depends upon the circumstances, and, Your Honor, you're now getting closer to that line that makes it very difficult to discern true employee dishonesty from negligence or recklessness or unethical conduct from true dishonesty. So the intent of the policy is, always has been, with the acknowledgement of the American Bankers Association, to cover embezzlement and embezzlement-type acts. And so if rules are bent, that happens every day. Why doesn't it just say acts of embezzlement or theft? Good question. You agree dishonesty is broader than embezzlement or theft? I think dishonesty can be broader than embezzlement because of the way that courts have construed the term for the last 100 years. And that is why, in 1976- What you mean embezzlement is I take the money from the bank. You have an account at the bank of $100, and I take $50 out of it. That's embezzlement. Versus I make a loan that the bank approves to Mr. X for $1 million, but Mr. X gives me some of his million. That's not really embezzlement, but that is dishonest. It's an embezzlement-type act, and that is intended to cover- But it's not pure embezzlement. And I think that's why you might use a more generic term so that you're not getting into the fine points of what is statutory embezzlement versus what is dishonesty and kickbacks and things like that. Let me ask you this hypothetical, which this might go to the second issue, which is whether commissions and bonuses can be a personal benefit. So it might be more in that world. But take a situation where if you hit $10 million in loans for the year, you get a big bonus. You're a banker. And you need a million more in loans. It's December 15th. And so you call three or four of your friends and say, Hey, look, I'm going to come up with these fake loan applications. And you fill out all kinds of lies. You lie about their income. You lie about their credit history. You lie about the collateral. And you have all your friends come in, sign these forms you filled out filled with lies, and they get loans that put you over the $10 million mark. But you would have to say, wouldn't you, that that's not covered? It depends upon what the evidence shows. I've never seen this case that you're talking about in 30 years of practicing in this narrow area. It's never that clean. If what you're telling me is the employee comes in and admits to each and every point that you've just stated, maybe you're going to be hurt. The bank wouldn't be hurt because they get their million dollars back. This person didn't really need them. Precisely. They've got a bonus structure that incentivizes people to kind of fake it out. That's a different problem. Well, no, but the loans wouldn't be. These people wouldn't have the ability to repay. But they got the money and just paid back. They're not investing it in anything the way these guys were. These guys were taking the money to use somewhere. If I didn't get a million dollars, I don't know. Okay, well, I mean, maybe they did. We don't know. It's a complex hypo. But there is all kinds of dishonesty. I mean, I prosecuted all kinds of mortgage cases where the banker was involved in lying about income, lying about credit history, lying about collateral, et cetera. Now, normally there's a kickback there. I'll give you that. Normally there's a kickback. I mean, why else would a banker commit professional suicide unless he or she was getting something out of it? And that's why those provisions were added with the knowledge and participation of the FDIC in 1980 and 1986. In those land flip days of the 80s, the bank and the savings and loans were profiting for a time and thought they would. And I think the employees involved, while also quite corrupt and improper, thought the banks would keep getting something. I mean, the flips would go on forever until something pulled the rug out from under, and then that's when everybody went to prison. But in the meantime, people were profiting, including the banks and the SNLs. And that's the same reason why bankers ignore loan policy every day, because they think in their heart of hearts that the loan is actually going to be paid. Back on the I-30 corridor in the 80s that you're talking about, properties were being flipped on a daily basis sometimes, and those developers were making money hand over foot. And the SNLs were, too. And the SNLs were. And bankers were looking the other way for certain, you know, regarding certain requirements, because it didn't matter because the loans got paid off. And that's what happens in 99 percent of these cases. But in the truly difficult cases that, Judge Costa, you raise, where it's incredibly difficult to determine what's in the mind of the employee, there has to be some objective indicia of true dishonesty. And that is what the American Bankers Association, working together with the Assurity Association of America, agreed upon in 1980 and then again in 1986. I have a question about your argument, and you do it artfully. It's not your primary argument, and you do it at the end by saying you're not really pressing that these aren't statutory bonds. But then you say, well, if we get to that issue, if they're arguing for this strict textual view of the law, then we should be entitled to that, too, and they wouldn't be statutory bonds. But if we were to find they weren't statutory bonds, wouldn't that mean these banks aren't lawfully operating? Because the statute requires a bank to have these bonds? What a great philosophical question. Well, it's not philosophical. It's practical because if our ruling would be saying that every bank in Mississippi because no bank has every employee go buy these things. Philosophical only because we could spend a half an hour talking about it. But do any banks have the actual employees go buy these things anymore? No, they haven't existed in 70 years. This policy that the legislature talked about in 1934 has not existed for a long, long time. And it's not just technical requirements that no longer exist. It's two different processes. It's suretyship on the one hand versus insurance on the other hand. Suretyship, the employee, and the bank losses over this. The employee goes out and acquires the product, and they are primarily liable. And guess what? They typically provide collateral for that. Today, everyday construction projects are collateralized by surety bonds. And the contractor provides collateral for it. That's what happened back in 1934. And it's a different product than is available on the market today. So if we were to define this not to be a statutory bond, which we may not need to reach the issue, but if we did, it's really the bank employees who are in violation of statute, not the bank. Well, it depends upon. It says the comptroller has to approve, should be inspected. Wouldn't banks stop buying your product, though, if it didn't make them in compliance with the state statute? I think it is a complicated question. Let me answer it first this way. I think the bank complied with what probably is expected of today by the Mississippi Banking Commission. They went out and they bought insurance for employee dishonesty. So if there is still that requirement in the statute, and let's keep in mind that that product doesn't exist, but if there's a requirement for employee dishonesty insurance, the bank complied with it. And guess what? It purchased the gold standard on the market. There's not a better policy available in the United States today than St. Paul's policy. And the Mississippi Commission charged with overseeing this hasn't gone around saying, Whoa, this ain't what we're talking about here. You know, you guys are out of compliance and started fining every bank in the state. Every banker, every regulator in the United States knows about this bond. I've had Roy Aarons from the FDIC on panels talking about this bond. I've had associate general counsels on panels talking about this bond. This isn't something that St. Paul slipped by somebody to try to earn an unfair dollar. This is the standard in the industry. Well, so including all of these provisions about what dishonesty is. Absolutely. So if Mississippi were in the view that this was not in compliance with their statute, they would pretty much have to shut down all of the banks in Mississippi. They would. They're not going to find a bank that has the anything is covered policy that your opponent would like to see. Your Honor, I made a comment earlier about how the policy that the bank thinks it wants would be too expensive to purchase. The reality is that is the case. The bank tried to make light of our comment in our brief about in the 1970s, there were only a dozen fidelity insurers writing these policies in the market. That's because they were losing money day after day after day. It is a strange marriage between the banking industry and the insurance industry when it comes to fidelity and dishonesty insurance. There's nothing like it that I'm aware of in the world of insurance. It truly is a marriage. They walked hand by hand for decades to come up with what we now have, and it's the best product in the market. Renasant wants a divorce from the marriage because they think it's too expensive. I think Renasant is very aware of what's been going on. One of their officers serves on the Board of Directors of the American Bar Association Insurance Services, just decided to do a quick Google search last night and saw that. I know that's probably neither here nor there, but again, it goes back to my point that St. Paul's not pulling a fast one over this bank. This is a sophisticated bank that participates in industry committees and the like, and they were aware of what they were purchasing. They've been represented by one of the foremost, plainest fidelity counsel in the country, Pat Artis. He knows what he's doing. The problem is, look, here's the fallacy of this case. My client's bond provides coverage for what the bank believed they purchased and for the very claim the bank asserted that a long-time loan officer made dishonest loans and received tens of thousands of dollars in jewelry and other kickbacks. That is covered. The problem came about because no evidence developed to support that claim. Okay. Thank you, Your Honor. Thank you. Mr. Shockley? Just briefly, Your Honors, there was a lot of, I think you started with the question about the prosecution of Wendy Hurt. We respectfully disagree with the district court's assessment that it's relevant at all in the considerations before, and, in fact, I believe it was improper. Whether or not Hurt was civilly prosecuted for this is a business decision to be made by the bank and is completely outside the relevant facts. Yeah, but should you let this dishonest person, as you perceive her, go out and work at another bank and do it again? Well, that's not up to the bank, frankly. Well, it kind of is. If you brought this to the authority's attention and they prosecuted her, then she's unlikely to get a job in a bank, whereas if you all sit quietly and just try to go after the insurance company, then she is going to go work at another bank. Well, I think that whether or not to criminally prosecute Hurt is a decision that's made by the district attorney, to which Renasant is not privy to that decision. Did you all file a complaint with the district attorney? No, we did not. How would the district attorney know about this? I'm not privy to how these things come before them. Repeatedly, I think this court, my opposing counsel, talked about how difficult it is to discern what's in the mind of an employee. I think that points to the fact that that's why it's a jury question. A jury is entitled to hear a case and hear all the surrounding circumstances, just as it did in the FNBL case, which is a Fifth Circuit decision. So let's say we have a jury trial, and the question is dishonesty of Ms. Hurt. What is the definition of dishonesty to be submitted to the jury? Well, Your Honor, I think that the court could instruct the jury how to differentiate between the two, whether it's negative. Give me that. And the word dishonesty, you are instructed that the word dishonesty means, quote, give it to me. Well, it means acting with intent. It means acting to deceive with intent. And I don't think that that you don't have to put hurdles such as she must receive a financial benefit over $2,500 and all of the things that are in the bond in order to reach that point. I think that juries make that kind of decision every day. The other point I wanted to address was that my opposing counsel says this is not an anything is covered kind of policy. Perhaps that was a statement by the court. This is what we're arguing for to comply with the Mississippi statute is not an anything is covered type of policy. What we're arguing for, the bank still has the duty under the policy to show, A, that there was a loss, and, B, that there was fraud of its employee, and it must prove that, and, 3, that the loss was due to the fraud. So there's still proof requirements. It's not that it just covers any loss or any negligence of any employee. You still have to prove fraud. There still has to be some definitional structure. I mean, even in the all covered type policies that insurance companies have, all risks policies, there's still definitions in there. They don't just say, We hereby cover all risks. Have a nice day. It still goes on for pages and pages even when it's in all risks. That's true. So it seems to me that you can't really expect an insurance company to not have definitions and not have restrictions and strictures in their policies. That's what they do. Well, in the case of a statutory bond, Your Honor, I would expect an insurance company to comply with the plain language of the statute and would have in it what the statute does. Well, the problem with the plain language of the statute is it ain't so plain because nobody's been following it for 80 years, including the Mississippi Commission on whoever, because they haven't been requiring the employee to go get the bond. That's correct, Your Honor, but I don't think it's this court's province to judicially abrogate a statute that's been around as long as it's been around and has language as plain as it has. I guess we've got to shut down all the banks in Mississippi then because none of them are in compliance with this statute. That's going to be a big day in Mississippi. Well, I think the market would work itself out. I think that the coverage would be provided, and either the statute would be revised by the legislature or the market would work itself out. That sounds like a little reexamination of the statutes in order, but I agree that's beyond our scope. I respect that. All right. Thank you. Thank you, Your Honors. Thank you for your time today. Thank you, Counselor.